UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANA M. FELICIANO,                                       :

                  Plaintiff,                   :

             -against-                    :   **REPORT AND RECOMMENDATION**

COMMISSIONER OF SOCIAL SECURITY,          :        10 Civ. 3151 (PGG)(KNF)

                Defendant.                   :
------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE PAUL G. GARDAPHE, UNITED STATES DISTRICT JUDGE

## BACKGROUND

Ana M. Feliciano ("Feliciano") commenced this action pro se against the Commissioner of Social Security ("Commissioner"), seeking review of an administrative law judge's ("ALJ") decision finding her ineligible for Supplemental Security Income ("SSI") payments, under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-1383f.  Thereafter, the Commissioner filed an answer to the complaint.  On September 8, 2010, your Honor issued a scheduling order, directing the Commissioner to file his motion for judgment on the pleadings, on or before November 19, 2010, and Feliciano to file any opposition, on or before January 21, 2011.  The Commissioner filed his motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  On December 16, 2010, an attorney entered an appearance on behalf of Feliciano.  On February 1, 2011, Feliciano's counsel made an application for an order enlarging the time to respond to the Commissioner's motion.  The application was denied on February 2, 2011, as was a subsequent motion for reconsideration. Before the Court is the Commissioner's unopposed motion for judgment on the pleadings.

*Administrative Procedural History*

On January 23, 2008, Feliciano filed an application for SSI benefits.  (Tr. 66).  Her application was denied and she requested a hearing before an ALJ.  (Tr. 66-73).  The hearing was conducted on September 4 and 22, 2009.  (Tr. 18-65).  On September 30, 2009, the ALJ found that Feliciano was not disabled.  (Tr. 6-17).  On January 15, 2010, the Appeals Council denied Feliciano's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  This action followed.

*Non-Medical Evidence*

At the time of the hearing, Feliciano was 47 years old and living in a shelter with her husband and eighteen-year old son.  (Tr. 22).  She completed ninth grade and, for fifteen years prior to the hearing, had not worked.  (Tr. 23).  At the hearing, Feliciano stated that she suffered from depression and anxiety and was forgetful. (Tr. 23).  She testified that she received drugs and therapy for her mental problems but they did not help much.  (Tr. 24).  She testified further that she had not used the medication Xanax for about one year, but had used cocaine as recently as April 2009.  (Tr. 25).  Feliciano stated that she was treated at Promesa Inc., a health services provider, for eight months and did not use drugs during that period.  (Tr. 31-32).  According to Feliciano,  she cooked, shopped, cleaned, spent time attending group counseling, visiting her mother-in-law with her husband, walking for exercise and going to the cinema.  (Tr. 25-26). When asked by the ALJ whether she had any physical symptoms or problems that would interfere with working, Feliciano responded that she had lower back pain, for which she took medication.  (Tr. 35).  In addition, she reported that, due to back pain, she could walk for a distance of only one block and could not stand for longer than twenty minutes at a time. (Tr. 36).  Feliciano advised the ALJ that she could lift and carry two bags of groceries.  (Tr. 36).

2

A vocational expert ("VE") testified at the hearing.  (Tr. 54-65).  The ALJ presented a hypothetical question to the VE, asking her to identify jobs at the medium, light, and sedentary levels that could be performed, assuming that the person: (i) is a woman of 47 years of age: (ii) has a ninth grade education; (iii) lacks a history of past relevant work; and (iv) is restricted to work tasks that are simple, routine, repetitive, low in stress and involve minimal amounts of social contact.  (Tr. 56).  The VE testified:

> Laundry worker is medium, SVP 2, 8000 locally and 250,000 nationally.  Also at medium is linen room attendant, medium, SVP 2, 4000 locally and 100,000 nationally.  At the light level we have assembly jobs that are SVP 2, 10,000 locally and 1,000,000 nationally.  And you asked for sedentary as well.  Sedentary we have jewelry bench work, SVP 2, 1000 locally and 50,000 nationally. . . . There are light packing jobs, SVP 2, 8000 locally and 1,000,000 nationally. . . . another sedentary, . . . a - - stone setter in jewelry also, sedentary, SVP 2, 1000 locally and 30,000 nationally. . . . And at the medium level there are 7000 [local packing jobs] and there are 400 sedentary packers [and] [t]hree-quarters of a million [national packers at the medium level].  (Tr. 56-57).

### *Medical Evidence*

<u>Promesa Health Services</u>

Feliciano was treated at Promesa Inc., during the period October 2007 through April 2009.  (Tr. 171-289).  On October 2, 2007, Feliciano's laboratory results were positive for cannabinoids, cocaine and Methadone.  (Tr. 173).  On October 19, 2007, the laboratory results were positive for cannabinoids and cocaine, and the November 9, 2007 results were positive for cannabinoids, cocaine and opiates.  (Tr. 174, 180).  Feliciano's November 14, 2007 laboratory results were positive for cannabinoids, cocaine, Benzodiazepine and Methadone.  (Tr. 181).  Her December 6, 2007 laboratory results were positive for Methadone.  (Tr. 182).

On December 18, 2007, Feliciano presented for examination with Dr. Daniel Rosa ("Dr. Rosa") "for transfer to MTA-R program."  (Tr. 252-53).  She indicated no medical concerns and

her examination resulted in no abnormal findings. (Tr. 252-53). On December 26, 2007, Feliciano complained about chest pain and Dr. Rosa examined her, reporting her lungs were clear and that palpation of the chest produced tenderness. (Tr. 254-57). An electrocardiogram administered to Feliciano revealed "no ischemic changes and no st elevations or depressions." (Tr. 255). Feliciano was advised that a negative electrocardiogram "does not rule out potentially serious or catastrophic causes," but she was unwilling to visit the emergency room. (Tr. 255).

Feliciano's January 5, 2008 laboratory results were positive for Benzodiazepine, cocaine and Methadone. (Tr. 186). On the same day, she visited Dr. Rosa complaining of cold symptoms. (Tr. 261). Upon examination, Dr. Rosa reported normal findings, assessed acute bronchitis and prescribed medication. (Tr. 261-62). On January 15, 2008, Feliciano saw Dr. Rosa to check a wound associated with her eyebrow piercing and reported no other medical concerns. (Tr. 265-66). Dr. Rosa reported no abnormal findings, assessed drug abuse and noted the latest laboratory results were "positive for cannabis, cocaine and benzos." (Tr. 266). On January 16 and 23, 2008, Feliciano tested positive for cocaine. (Tr. 191-92). On February 2, 2008, Feliciano visited Dr. Rosa, complaining of leg pain and cold symptoms. (Tr. 272-73). Dr. Rosa examined Feliciano and  reported no abnormalities, assessing asthma and limb pain. (Tr. 272-73).

<u>Treatment by Nurse Practitioners and Non-Physicians</u>

On October 3, 2007, Feliciano was seen by nurse practitioner Romeeda Mohammed for complaints of back pain. (Tr. 249). A physical examination revealed normal musculature with no skeletal tenderness or joint deformity. (Tr. 249-50). The nurse practitioner's assessment was acute backache, not otherwise specified, with unremarkable physical examination. (Tr. 249-50). On November 30, 2007, it was reported that Feliciano's global assessment of functioning

("GAF") was 55.  (Tr. 188).

On December 19, 2007, Feliciano was seen by Lucy Palomino ("Palomino"), a nurse

practitioner.  (Tr, 183-84).  Feliciano requested that her psychiatric medication be reinstated,

explaining that the medications had been discontinued after she entered the residential

detoxification program.  (Tr. 183).  Physical examination of Feliciano revealed no apparent

distress, her lungs were clear and she had a regular heart rhythm with no evidence of heart

murmur, gallops or rubs.  (Tr. 183).  An evaluation of Feliciano's mental state produced no

evidence of mood swings but showed evidence of poor attention span and concentration, without

suicidal ideation.  (Tr. 183).  Palomino indicated that Feliciano's chronic problems were

affective psychosis, opioid dependence and osteoarthritis, and she reinstated Feliciano's

medications.  (Tr. 183-84).  Feliciano's December 20, 2007 laboratory results were positive for

cocaine and cannabinoids.  (Tr. 185).  On January 2, 2008, Feliciano was seen for a urinary tract

infection, and Palomino reported that she was not in acute distress and denied fever, fatigue or

night sweats.  (Tr. 258-60).

On January 11, 2008, Feliciano visited Sylvia Cotto ("Cotto"), a nurse practitioner,

complaining of anxiety, and Cotto noted that Feliciano was recently admitted to a residential

detoxification program.  (Tr. 187).  Feliciano tested positive for cocaine on that day.  (Tr. 190).

She complained of difficulty adjusting to the rules of the rehabilitation program.  (Tr. 187).

Cotto noted that Feliciano's appearance, speech and affect were appropriate.  (Tr. 187).

Feliciano's psychomotor behavior was unremarkable, her attitude cooperative and her memory

intact.  (Tr. 187).  Cotto described Feliciano's intellect as below average but her reasoning skill,

as well as her impulse control, judgment and insight, as fair.  (Tr. 187).  Feliciano expressed no

suicidal or homicidal ideation and was determined to have a urinary tract infection.  (Tr. 187).

On February 11, 2008, Feliciano visited Palomino due to cold symptoms.  (Tr. 274). Palomino examined her and reported diffuse wheezing on the right side of Feliciano's chest, but her lungs were clear.  (Tr. 275).  On February 20, 2008, Palomino saw Feliciano because of discomfort in her urinary tract and pain in her right leg.  (Tr. 277).  Palomino reported finding no apparent distress and assessed Feliciano as having a urinary tract infection.  (Tr. 278).  On February 27, 2008, Feliciano was seen by Lise Vincent for a painful bunion and fungal toe nail and was assessed with chronic bursitis, hallux valgus and onychomycosis.  (Tr. 285-86).

On March 11, 2008, Feliciano was seen by Cotto for leg pain; the examination revealed no musculoskeletal abnormality.  (Tr. 287-88).  Cotto noted that Feliciano had a decreased range of motion and assessed chronic limb pain.  (Tr. 288).  On April 1, 2008, Cotto reported no signs of psychosis or mania.  (Tr. 200).  Feliciano was well groomed and exhibited no unremarkable behavior.  (Tr. 200).  Her attention span was normal, reasoning fair, memory intact and thoughts logical.  (Tr. 200).

On May 29, 2008, Feliciano visited Cotto to renew her medication and admitted intermittent cocaine use.  (Tr. 203).  Cotto determined that Feliciano's mental status had not changed from the April 1, 2008 examination, except that her reasoning, judgment and insight were assessed as poor.  (Tr. 204).  On July 27, 2008, Feliciano visited Cotto without an appointment and stated she was on Methadone.  (Tr. 207).  A mental status evaluation showed no signs of psychosis or mania and her psychobehavior and thought content were described as unremarkable.  (Tr. 208).  Although Feliciano's mood was anxious, her affect was appropriate and she exhibited a cooperative attitude.  (Tr. 208).  Cotto reported that Feliciano's memory was intact, she was able to maintain attention and her reasoning, judgment and insight were fair. (Tr. 208).

On August 1, 2008, Feliciano visited Cotto concerning renewal of her medication and stated that she had used cocaine and Xanax one month earlier.  (Tr. 211).  Feliciano reported that she had not experienced side effects from any medication.  (Tr. 211).  Cotto found no signs of psychosis or mania and noted that Feliciano's appearance was inappropriate because she was dressed in a formal black dress and had very long earrings and heavy makeup.  (Tr. 212).  Cotto noted Feliciano's affect and mood were labile, her memory intact and she was cooperative.  (Tr. 212).  Feliciano's reasoning was poor and her impulse control, judgment and insight were fair.  (Tr. 212).  On August 28, 2008, Feliciano visited Cotto to renew her medications and Cotto noted that her mood was more stable and she had no crying spells.  (Tr. 215-17).  Feliciano's mental status evaluation was unremarkable.  (Tr. 216).

On August 28, 2008, Cotto[1] completed a psychiatric assessment of Feliciano.  (Tr. 449-53).  She stated that Feliciano was receiving psychiatric treatment at Promesa Inc., once a month, since 2006.  (Tr. 449).  Cotto described Feliciano's symptoms as mood swings, insomnia, anxiety, crying spells and irritability.  (Tr. 449).  She diagnosed major and recurrent depression and hypertension and reported that Feliciano's GAF was 55.  (Tr. 450).  Cotto stated that Feliciano was a chronic substance abuser with many failed attempts at abstinence.  (Tr. 450).  In assessing Feliciano's mental functional capacity, Cotto indicated poor ability to: (1) follow work rules; (2) deal with the public; (3) relate to co-workers; (4) use judgment; (5) interact with supervisors; (6) understand, remember and carry out complex and detailed, but not complex job

---

[1] Although word-processed documents indicate the name of the person who examined Feliciano on multiple occasions as Sylvia Cotto, the psychiatric evaluation shows a handwritten signature by "Sylvia Cotter, N.P. Promesa."  It appears from the ALJ's decision that Sylvia Cotto and Sylvia Cotter are the same person.  The Court will refer to the author of the August 28, 2008 psychiatric assessment as Cotto.

instructions; (7) behave in an emotionally stable manner; (8) relate predictably in social situations; and (9) demonstrate reliability. (Tr. 451-52). She stated Feliciano had a fair ability to: (a) function independently; (b) maintain attention; (c) understand, remember and carry out simple job instructions; and (d) maintain personal appearance. (Tr. 451-52). Cotto described Feliciano's limitations as borderline intelligence, concrete thinking, slow processing of information, forgetfulness and poor concentration and retention ability. (Tr. 452).

On November 7, 2008, Feliciano visited Cotto to renew her medication. (Tr. 220). She was in post-detoxification for cocaine and Xanax status. (Tr. 220). In describing Feliciano's mental status, Cotto noted anxious mood and unremarkable behavior and psychomotor behavior. (Tr. 221). Feliciano had fair reasoning, impulse control, judgment and insight and her thought process was logical. (Tr. 221). On December 12, 2008, Feliciano reported to Cotto that she was feeling anxious, during the day, and asked to have her Prozac dosage increased. (Tr. 224). Her mental status was not changed. (Tr. 225).

On January 9, 2009, Feliciano visited Cotto to renew her medication and admitted using cocaine and drinking alcohol over the holidays. (Tr. 228-30). Cotto assessed her mood as irritable, attention distracted and insight and reasoning poor. (Tr. 229). On February 6, 2009, Feliciano visited Cotto, complaining of stress resulting from discord with her husband. (Tr. 232-34). Cotto reported no signs of psychosis or mania and that Feliciano was well groomed. (Tr. 233). Her behavior was unremarkable, her affect labile, mood anxious, memory intact, attention maintained and thought process logical. (Tr. 233-34). Feliciano's reasoning, impulse control, judgment and insight were fair and Cotto found that Feliciano's self-perception was realistic. (Tr. 233-34). On February 20, 2009, Feliciano reported to Cotto that she felt increasingly anxious and her medication was not working. (Tr. 236). She admitted using Xanax

8

intermittently and that she had taken Prozac and Trazodone. (Tr. 236). Her mental status evaluation showed unremarkable findings. (Tr. 237-38). On April 2, 2009, Feliciano visited Cotto in order to renew her medication. (Tr. 240). At that time, she complained of feeling anxious and stressed. (Tr. 240). Her speech was described as excessive, her attitude cooperative, but discouraged. (Tr. 241). Cotto noted that Feliciano's mood was anxious, but other findings were unremarkable. (Tr. 241).

      <u>Dr. David Guttman</u>

      On March 20, 2008, at the reference of the Division of Disability Determination, Dr. David Guttman ("Dr. Guttman") conducted an internal medicine examination of Feliciano. (Tr. 145-48). Dr. Guttman found that she was five feet, four inches tall, weighed 193 pounds and her blood pressure was 120/80. (Tr. 146). Dr. Guttman noted that Feliciano complained of asthma, chest pain, back pain, depression and hypertension. (Tr. 145). He indicated that Feliciano appeared to be in no acute distress, her gait was normal, she could walk on heels and toes without difficulty, squat fully, had normal stance and needed no help changing or getting on or off the examination table. (Tr. 146). The examination revealed that Feliciano's lungs were clear and her heart rhythm was regular. (Tr. 146). Dr. Guttman's musculoskeletal examination revealed that Feliciano had full cervical and lumbar spine motion and her straight leg rasing was negative. (Tr. 147). She also demonstrated full range of motions in her shoulders, elbows, forearms and wrists, as well as her hips, knees and ankles. (Tr. 147). According to Dr. Guttman, Feliciano had full muscle strength in her upper and lower extremities and he found that deep tendon reflexes were physiologic and equal in her upper and lower extremities and no sensory or motor deficit existed. (Tr. 147). Dr. Guttman diagnosed asthma, nonexertional chest pain, low back pain, depression and hypertension. (Tr. 147). He recommended that Feliciano be referred

for psychological evaluation and that she avoid exposure to smoke, dust and other respiratory irritants.  (Tr. 148).

        Dr. Herbert Meadow

        On March 20, 2008, Dr. Herbert Meadow ("Dr. Meadow") conducted a psychiatric evaluation of Feliciano.  (Tr. 149-52).  He noted that Feliciano's demeanor was cooperative and her manner of relating adequate.  (Tr. 150).  Feliciano was appropriately dressed, neat, causal and well groomed.  (Tr. 150).  Her gait, posture and motor behavior were normal and her eye contact appropriate.  (Tr. 150).  Feliciano's speech was fluent and clear and her language adequate.  (Tr. 150).  Dr. Meadow determined that Feliciano's thought process was coherent and goal directed, with no evidence of hallucinations, delusions or paranoia and her speech and thought content were appropriate.  (Tr. 150).  Dr. Meadow observed that Feliciano's mood was depressed and he stated that her attention and concentration were impaired, due to her limited intellect.  (Tr. 150).  Feliciano acknowledged that she always had problems with math and she was unable to count serial threes from twenty.  (Tr. 150).  Her recent and remote memory were intact, based on Feliciano's demonstrated ability to remember.  (Tr. 151).  However, her cognitive functioning was below average.  (Tr. 151).  Concerning Feliciano's daily activities, Dr. Meadow reported that she cooked, cleaned, did laundry, shopped, managed her money and took public transportation.  (Tr. 151).  She also socialized with friends and family, read and watched television.  (Tr. 151).  Dr. Meadow diagnosed depression disorder, polysubstance abuse and dependence in partial remission, opiate dependence, hypertension, asthma and back pain. (Tr. 151).  He recommended that Feliciano continue with psychiatric treatment and that she would need assistance managing funds as she has problems with math.  (Tr. 152).  He opined that Feliciano would be able to perform all tasks necessary for vocational functioning and that

10

her psychiatric problems do not appear to be significant enough to interfere with her ability to function on a daily basis.  (Tr. 151).

### Albert Einstein College of Medicine Substance Abuse Program

Feliciano was treated at the Albert Einstein College of Medicine Substance Abuse Program during the period April through October 2008.  (Tr. 343-441).  As of April 7, 2008, a schedule was established for Feliciano to obtain 70 mg of Methadone six days per week.  (Tr. 343).  She acknowledged that her mental state was stable and stated she was on public assistance and did not wish to work at that time.  (Tr. 349).  A social worker recommended extensive vocational counseling to prepare Feliciano for work.  (Tr. 354).  On July 11, 2008, it was noted that Feliciano struggled in treatment.  (Tr. 359).  On October 6, 2008, it was noted that she was treated at Conifer Park, an inpatient drug treatment program, for detoxification and rehabilitation.  (Tr. 361).

On October 21, 2008, Feliciano was seen by Dr. Robert Roose ("Dr. Roose"), who noted that she was, at that time, in Conifer Park for detoxification and rehabilitation for thirty days and was feeling much better.  (Tr. 402).  He stated that Feliciano had been detoxicated from Xanax and cocaine and the treatment was successful in reducing her Methadone dosage.  (Tr. 402).  Feliciano complained of body aches and chills and Dr. Roose increased her Methadone dosage.  (Tr. 402).

On February 10, 2009, Dr. Roose noted that Feliciano's mood was depressed, her affect restricted and she was tearful.  (Tr. 402).  He observed that Feliciano was well groomed.  (Tr. 402).  According to Dr. Roose, Feliciano was harboring suicidal ideation and she was not exhibiting any evidence of psychosis.  (Tr. 402).  Dr. Roose's assessment was suicidal ideation precipitated by stressful event, but he did not believe that she would carry out her feelings.

11

(Tr. 402).  He advised Feliciano to call 911 if she felt like hurting or killing herself.  (Tr. 402).
Feliciano declined an offer to be taken to an emergency room.  (Tr. 402).

On April 13, 2009, Feliciano complained to Dr. Roose about chest pain.  (Tr. 403).  Her
blood pressure was 140/85 and Dr. Roose concluded that her chest pain was atypical for angina.
(Tr. 403).  He referred Feliciano for a chest x-ray and stress echocardiogram (Tr. 403).  Dr.
Roose stated that Feliciano was not taking any hypertension medication and started her on
Lisinopril for her hypertension.  (Tr. 403).  When Feliciano saw Dr. Roose on April 22, 2009, he
noted that she had a stress test and had not experienced any new or significant chest pain during
the test or during the past week.  (Tr. 404).  Feliciano denied shortness of breath.  (Tr. 404).  Her
stress test was negative for symptoms or other abnormality.  (Tr. 404).  Dr. Roose's assessment
was hypertension with elevated blood pressure at rest and during the stress test.  (Tr. 404).

Conifer Park

Feliciano was treated at Conifer Park during the period September 22 to October 20,
2008.  (Tr. 291-341, 44-48).  She was diagnosed on admission with cocaine dependence,
sedative dependence, history of anxiety and depression and nicotine dependence.  (Tr. 291).
During her stay, Feliciano was monitored for asthma, allergies and upper respiratory infection.
(Tr. 291).  She was also seen for complaints about lower back pain, which radiated into her right
leg, but x-rays were negative.  (Tr. 291, 339).  Feliciano's clinical discharge summary indicates
that she had a history of pancreatitis, high blood pressure and asthma.  (Tr. 294).  The summary
indicated Feliciano was employable.  (Tr. 295).

Dr. Richard Wagman

Dr. Richard Wagman ("Dr. Wagman"), an internist, testified as a medial expert at the
administrative hearing.  (Tr. 37-38).  He reviewed all the medical evidence on the record and

heard Feliciano's testimony at the hearing.  Dr. Wagman stated that Feliciano had a history of

high blood pressure, which appeared to be under control, and that she had a history of chest pain,

but a stress test was negative.  (Tr. 37).  He testified that no evidence existed that Feliciano had

cardiac disease or an enlarged heart.  (Tr. 37).  Regarding Feliciano's back pain, he noted that x-

rays of her lumbar spine were entirely normal.  (Tr. 37).  According to Dr. Wagman, Feliciano

did not have a major back problem and she had a history of asthma, which was symptomatic

only about once a year and was not a major problem.  (Tr. 37).  He noted a reference to

pancreatitis in the record but stated that no evidence existed that Feliciano was treated for this

condition during the last few years.  (Tr. 37).  Dr. Wagman concluded that Feliciano did not have

a medically determinable impairment which restricted her physical functioning.  (Tr. 37).

Dr. Leslie Fine

Dr. Leslie Fine ("Dr. Fine"), a psychiatrist, testified as a medical expert at the hearing.

(Tr. 40-51).  Dr. Fine reviewed all the medical evidence on the record and heard Feliciano's

testimony at the hearing.  Dr. Fine testified that Feliciano had a history of depressive disorder

and anxiety for which she was on Celexa, Wellbutrin and a small dose of Adarax, and that she

used other antidepressants in the past.  (Tr. 40).  Dr. Fine noted that Albert Einstein College of

Medicine Substance Abuse Program records indicate that Feliciano's mental health was stable.

(Tr. 40-41).  Dr. Fine opined that Feliciano's mental impairment did not satisfy the requirements

of the listing of impairments.  (Tr. 44).  Dr. Fine also opined that Feliciano's substance abuse

aggravated her mood disorder, but her daily activities are only mildly limited, her social

functioning was mildly to moderately limited, her concentration, persistence or pace were

moderately limited and no deterioration in work-life setting existed.  (Tr. 44).  Dr. Fine's opinion

was that Feliciano was capable of working, but was limited to simple, repetitive, low stress

13

work, where she would have minimal contact with others.  (Tr. 45).  Dr. Fine testified that

Cotto's August 28, 2008 assessment was not consistent with the evidence in the record.  (Tr. 50).

***The ALJ's Decision***

On September 30, 2009, the ALJ rendered his decision.  (Tr. 9-17).  The ALJ stated that

the issue was whether Feliciano was under disability, as that term was defined in SSA for the

purpose of determining eligibility for SSI under Title XVI of the Act.  (Tr. 10).  The ALJ

explained that SSI payments do not begin until the month after the month in which the

application is filed, assuming all eligibility requirements are met; thus, the specific issue was

whether Feliciano was disabled since January 23, 2008, the date of her application for benefits.

(Tr. 10).  The ALJ stated Feliciano testified that she suffers from depression and anxiety and that

her mind was not well.  (Tr. 12).  She testified that she cries a lot and she was intermittently

teary throughout the hearing.  (Tr. 12).  Feliciano also testified that: (i) she hears voices and does

not sleep well; and (ii) in the past, she once felt suicidal.  (Tr. 12).  She testified that she has

constant lower back pain, for which she takes medication, and she had chest pain in the past, but

not lately.  (Tr. 12).  According to Feliciano, she had "a touch of asthma."  (Tr. 12).  The ALJ

noted that Feliciano is married with one son and lives in a shelter, and she uses public

transportation to travel.  (Tr. 12).  Feliciano testified that she was treated at Promesa, Inc.

(Tr. 12).  The ALJ noted Feliciano's testimony about her daily activities, noting she cooked,

shopped and cleaned, although she did not feel like doing chores on some days.

The ALJ stated that Feliciano's records provide very little support for her claim of any

significant physical condition that impedes her ability to function.  (Tr. 13).  He noted that she

had hypertension and asthma, both controlled by medication, occasional back pain and once she

had reported right leg pain and left hip pain.  (Tr. 13).  The ALJ noted that Feliciano's clinical

14

examinations have been "quite unremarkable." (Tr. 13). He observed that the record evidence supports Feliciano's psychiatric complaints, because she had frequent positive urine toxicologies for various drugs during the entire period covered by her records, until April 2009. (Tr. 13). The ALJ described: (a) Feliciano's inpatient detoxification stay at Conifer Park in 2008; (b) Cotto's August 28, 2008 report and functional assessment; (c) Dr. Meadow's consultative psychiatric evaluation; (d) Dr. Wagman's testimony; and (e) Dr. Fine's testimony. (Tr. 13).

The ALJ stated that he agreed with Dr. Wagman that Feliciano has no proven severe medical impairment and that any physical limitation is not sufficient to render her disabled. (Tr. 14). The ALJ found that Feliciano has "an affective disorder," which is "best described as depressive disorder [not otherwise specified]," aggravated by her substance abuse. (Tr. 14). The ALJ stated that Feliciano's assertion that she hears voices is not documented in the record and "she carries no diagnostic suggestion of any psychosis nor is she given medication for such a symptom." (Tr. 14). In connection with that part of the testimony, "as well as with several other aspects of her testimony," the ALJ found Feliciano to be an unreliable witness. (Tr. 14).

The ALJ noted that Cotto stated in her August 2008 assessment that Feliciano was extremely impaired by her condition, but she also included a substance abuse diagnosis in her report, mentioning that Feliciano is a chronic substance abuser with multiple failed attempts to remain abstinent. (Tr. 14). The ALJ stated that "the document shows on its face that in offering her ratings, Ms. Cotto was considering not merely [Feliciano's] affective disorder, but also her persistent substance abuse. Of course such a consideration is inappropriate for a determination as to whether or not a person is 'disabled' under the Social Security regulations." (Tr. 15). Moreover, the ALJ found that Cotto was not entitled to treating physician status, since she is neither a medical doctor nor a clinical psychologist. (Tr. 15). The ALJ concluded: "Combining

15

that fact with the discrepancy (as Dr. Fine also observed) between Ms. Cotto's assigned GAF score <u>and</u> her own clinic's notes and records, I conclude that her extreme functional assessment is entitled to very little weight." (Tr. 15).

The ALJ found that Feliciano's "only proven 'severe' medically-determinable impairments are a depressive disorder [not otherwise specified] and polysubstance abuse (not in remission for at least most of the time relevant to this claim)." (Tr. 15). The ALJ agreed with Dr. Fine that Feliciano's depressive disorder, not otherwise specified, does not rise to listings-level severity, "nor, indeed, would it even with substance abuse considered." (Tr. 15). The ALJ found that Feliciano's "mental impairments impact her activities of daily living only mildly, and her social functioning and concentration/persistence/pace only moderately, for substantially all the period since her application." (Tr. 15). The ALJ also found that "despite her mental impairments, Ms. Feliciano retains the ability to perform work activity that is simple, repetitive, low in stress, and involves only minimal amounts of social interaction." (Tr. 15). The ALJ noted the testimony of the VE about available jobs and determined that the assumptions in Feliciano's counsel's questions to the VE were not supported by the record. (Tr. 15). The ALJ concluded that Feliciano was not under disability, as defined in SSA at any time through the date of his decision. (Tr. 17).

***Motion for Judgment on the Pleadings***

In her complaint, Feliciano asserts that the ALJ's decision was not supported by substantial evidence and was contrary to law. In his motion, the Commissioner contends that substantial evidence supports the ALJ's finding that Feliciano was not disabled and that she had residual functional capacity for a full range of physical work that is simple, repetitive, low stress and requiring minimal social interaction. Similarly, substantial evidence supports the ALJ's

finding that Feliciano was capable of performing a significant number of jobs in the national

economy.  The Commissioner  argues that the ALJ's decision should be affirmed.

**DISCUSSION**

***Legal Standard***

"After the pleadings are closed—but early enough not to delay trial—a party may move

for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The court shall have power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the Commissioner of Social Security, with or without remanding the cause for a

rehearing."  42 U.S.C. § 405(g).

> A district court may set aside the Commissioner's determination that a claimant is
> not disabled only if the factual findings are not supported by "substantial evidence"
> or if the decision is based on legal error.  Substantial evidence "means such relevant
> evidence as a reasonable mind might accept as adequate to support a conclusion."

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).  "Failure to apply the

correct legal standard constitutes reversible error, including, in certain circumstances, failure to

adhere to the applicable regulations."  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008)

(internal citations omitted).   "It is not the function of a reviewing court to decide *de novo*

whether a claimant was disabled, or to answer in the first instance the inquiries posed by the

five-step analysis set out in the SSA regulations."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir.

1999) (internal citation omitted).

Title XVI of the SSA program provides benefits to "[e]ach aged, blind, or disabled

individual who does not have an eligible spouse" and whose income and resources fall below a

certain level.  42 U.S.C. § 1382(a).  To qualify for disability benefits, an individual must prove

that she is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.912(a).  SSA regulations establish a five-step

process for determining a disability claim.  See 20 C.F.R. § 416.920(a)(4).

> If at any step a finding of disability or nondisability can be made, the [Social Security Administration] will not review the claim further.  At the first step, the agency will find nondisability unless, the claimant shows that he is not working at a "substantial gainful activity."  At step two, the [Social Security Administration] will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [Social Security Administration] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the [Social Security Administration] to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003) ( internal citations

omitted).  "[T]he ALJ generally has an affirmative obligation to develop the administrative

record."  Melville, 198 F.3d at 51.  Additionally, in determining disability, the ALJ must adhere

to the regulations governing the evaluation of the severity of mental impairments, which "require

application of a 'special technique' at the second and third steps of the five-step framework, and

at each level of administrative review."  Kohler, 546 F.3d at 265 (citations omitted); see 20

C.F.R. §416.920a(a).  If the claimant is found to have a mental impairment, the ALJ must rate

the degree of functional limitation resulting from the impairment in four broad functional areas

in order to determine the severity of mental impairments: (1) activities of daily living; (2) social

functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.  See 20

18

C.F.R. § 416.920a(c)(3).  If a claimant's mental impairment is severe, the ALJ then determines if

it meets or is equivalent in severity to a listed mental disorder.  See 20 C.F.R. § 416.920a(d)(2).

This is done "by comparing the medical findings about [the claimant's] impairment(s) and the

rating of the degree of functional limitation to the criteria of the appropriate listed mental

disorder."  20 C.F.R. § 416.920a(d)(2).  If the ALJ finds that the claimant has "a severe mental

impairment(s) that neither meets nor is equivalent in severity to any listing, [the ALJ] will then

assess [the claimant's] residual functional capacity."  20 C.F.R. § 416.920a(d)(3).  The

application of this process must be documented.  See 20 C.F.R. § 416.920a(e).

> [T]he written decision must incorporate the pertinent findings and conclusions based
> on the technique.  The decision must show the significant history, including
> examination and laboratory findings, and the functional limitations that were
> considered in reaching a conclusion about the severity of the mental impairment(s).
> The decision must include a specific finding as to the degree of limitation in each of
> the functional areas described in paragraph (c) of this section.

> 20 C.F.R. §416.920a(e)(4).

In making his decision, the ALJ must consider: "(1) the objective medical facts;

(2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or

disability testified to by the claimant or others; and (4) the claimant's educational background,

age, and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v.

Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).  "Although the claimant bears the general burden

of proving that he is disabled under the statute, 'if the claimant shows that his impairment

renders him unable to perform his past work, the burden then shifts to the [Commissioner] to

show there is other gainful work in the national economy which the claimant could perform.'"

Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (quoting Carroll v. Sec'y of Health &

Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

***Application of Legal Standard***

The ALJ evaluated Feliciano's claim by applying the five-step sequential process for determining her disability claim and he adhered to the regulations governing the evaluation of the severity of her mental impairments.  Although he determined that Feliciano had a depressive disorder and polysubstance abuse, the impairments did not meet or equal the requirements of any listed impairment, 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ then determined that Feliciano had the residual functional capacity to perform a full range of physical work, but was limited to work that was simple, repetitive, low stress and requiring minimal social interaction. At the fourth step of the sequential evaluation, the ALJ found that Feliciano did not have any past relevant work experience.  At the fifth step, the ALJ considered Feliciano's vocational factors, her residual functional capacity and the testimony of the VE, finding that a significant number of jobs existed in the national economy that Feliciano could perform.

The ALJ documented Feliciano's history, including examination and laboratory findings, and the functional limitations that he considered in reaching his conclusion about the severity of her mental impairments.  The ALJ explained, properly, why he did not give much weight to Cotto's August 28, 2008 report and functional assessment.  Although Feliciano was represented by counsel at the hearing, the ALJ took a proactive role in questioning her about the alleged physical impairments, after her counsel failed to elicit such testimony from her.  The ALJ considered the entire record carefully, noting discrepancies, and he explained why he found parts of Feliciano's testimony unreliable.  Moreover, the ALJ relied properly on the testimony of the VE.  Upon review of the record, the Court finds that the ALJ followed the regulations properly in reaching his decision, and the ALJ's decision is supported by substantial evidence.

## RECOMMENDATION

For the foregoing reasons, I recommend that the Commissioner's decision be affirmed and that the defendant's motion for judgment on the pleadings, Docket Entry No. 9, be granted.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardaphe, 500 Pearl Street, Room 920, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 540, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Gardaphe. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York
       July 15, 2011

Respectfully submitted,

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

21